United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 8, 2004**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

No. 02-20116
_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ENRIQUE VARGAS-DURAN,

Defendant - Appellant.

_____

Appeal from the United States District Court
For the Southern District of Texas

_____

Before KING, Chief Judge, and JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, WIENER, BARKSDALE, EMILIO M. GARZA, DeMOSS, BENAVIDES, STEWART, DENNIS, CLEMENT, and PRADO, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

This appeal contemplates the application of a sentence enhancement to a defendant's sentence for being unlawfully present in the United States in violation of 8 U.S.C. § 1326 (2000). The Pre-Sentencing Report ("PSR") recommended that a sixteen-level enhancement be added to a base offense level of eight because Enrique Vargas-Duran ("Vargas-Duran") previously had been convicted of intoxication assault under Texas law. Vargas-Duran objected to the enhancement, arguing it was improper because intoxication assault was not a crime of violence under § 2L1.2 of

the U.S. Sentencing Guidelines Manual ("U.S.S.G."). The district court agreed with the PSR's recommendation and enhanced Vargas-Duran's sentence. On appeal, a majority of a panel of this Court affirmed the district court, holding that intoxication assault required the use of force, and, as such, met the U.S.S.G. definition of a crime of violence.

This Court now examines and clarifies the law with respect to sentencing enhancements which require "as an element the use, attempted use, or threatened use of physical force against the person of another." U.S.S.G. § 2L1.2, Application Note 1(B)(ii)(I) (2001). We hold that the "use" of force requires that a defendant intentionally avail himself of that force. We further hold that the intentional use of force must be an element of the predicate offense if the predicate offense is to enhance a defendant's sentence. Because the intentional use of force is not an element of the crime of Texas intoxication assault, we VACATE Vargas-Duran's sentence and REMAND his case for resentencing in accordance with this opinion.

## I. FACTS AND PROCEEDINGS

In 1996, Vargas-Duran, a citizen of Mexico, was convicted of intoxication assault in Texas state court. Under the Texas statute, a person was guilty of intoxication assault when that person, "by accident or mistake, while operating an aircraft, watercraft or motor vehicle in a public place while intoxicated, by reason of that intoxication causes serious bodily injury to another." TEX. PENAL CODE ANN. § 49.07 (1994).[1] Following his conviction and sentence, Vargas-Duran was deported from Hidalgo, Texas to Mexico.

On June 24, 2001, Vargas-Duran was again found in Texas. He pleaded guilty to being

---

[1]The 1999 amendment to this statute is of no moment to this appeal.

unlawfully present in the United States in violation of 8 U.S.C. § 1326(a) and (b)(2).[2]  A PSR was

prepared using the 2001 version of the Federal Sentencing Guidelines.  The base level of Vargas-

Duran's offense was eight; the PSR recommended a sixteen-level enhancement pursuant to U.S.S.G.

§ 2L1.2.  Section 2L1.2(b)(1)(A)(ii) provides for a sixteen-level enhancement if "the defendant

previously was deported, or unlawfully remained in the United States, after . . . a conviction for a

felony that is a . . . crime of violence."  The Application Notes define "crime of violence" either as

one of a list of enumerated offenses or as "an offense under federal, state, or local law that has as an

element the use, attempted use, or threatened use of physical force against the person of another."

U.S.S.G. Application Note 1(B)(ii)(I).  The PSR recommended that Vargas-Duran's 1996 conviction

---

[2]Section 1326, title 8, states in pertinent part:
   (a) In general
       Subject to subsection (b) of this section, any alien who –
           (1) has been denied admission, excluded, deported, or removed or has
           departed the United States while an order of exclusion, deportation,
           or removal is outstanding, and thereafter
           (2) enters, attempts to enter, or is at any time found in, the United
           States, unless (A) prior to his reembarkation at a place outside the
           United States or his application for admission from foreign contiguous
           territory, the Attorney General has expressly consented to such alien's
           reapplying for admission; or (B) with respect to an alien previously
           denied admission and removed, unless such alien shall establish that he
           was not required to obtain such advance consent under this chapter or
           any prior Act,
       shall be fined under title 18, or imprisoned not more than 2 years, or
       both.
   (b) Criminal penalties for reentry of certain removed aliens
       Notwithstanding subsection (a) of this section, in the case of any alien
       described in such subsection –

       . . .

           (2) whose removal was subsequent to a conviction for commission of
           an aggravated felony, such alien shall be fined under such title,
           imprisoned not more than 20 years, or both[.]

3

for intoxication assault be considered a crime of violence for purposes of enhancing his sentence.

The district court agreed with the PSR. In adopting the PSR's recommendation, the district court sentenced Vargas-Duran to a sixty-four month term of imprisonment and a three-year term of supervised release. Vargas-Duran timely appealed.

On January 16, 2003, a majority of a panel of this Court affirmed the enhancement of Vargas-Duran's sentence. *United States v. Vargas-Duran*, 319 F.3d 194, 199 (5th Cir. 2003), *vacated and reh'g granted by* 336 F.3d 418 (5th Cir. 2003). As a preliminary matter, the panel majority observed that because intoxication assault is not one of the enumerated offenses under § 2L1.2, Vargas-Duran's sentence could only be enhanced if the crime of intoxication assault had "as an element the use, attempted use, or threatened use of physical force against the person of another." 319 F.3d at 196 (citations omitted). Next, the majority reiterated the rule that this Court "need not discuss the facts underlying Vargas-Duran's prior conviction, since we 'look only to the fact of conviction and the statutory definition of the prior offense' to determine whether a prior conviction qualifies as a predicate offense for sentencing enhancement purposes." *Id.* (citations omitted).

Because intoxication assault requires that an intoxicated offender "cause[] serious bodily injury to another," the majority concluded that the crime has as an element the use of force. 319 F.3d at 196. Observing that neither Vargas-Duran nor any Texas decision gave an example of an instance in which a defendant was convicted of intoxication assault *without* using physical force against a person, the majority concluded that causing serious bodily injury "qualifie[d]" as using force. *Id.* at 196-97.

Vargas-Duran's primary contention was that "use of force" implied the intentional use of force. Relying on this Court's decision in *United States v. Chapa-Garza*, 243 F.3d 921 (5th Cir.

4

2001), in which we held that the sentence of a defendant with a prior conviction for driving while intoxicated ("DWI") could not be enhanced as a crime of violence, Vargas-Duran argued that the approach endorsed by *Chapa-Garza* similarly should apply to intoxication assault. 319 F.3d at 197.

The majority disagreed with Vargas-Duran's proposed use of *Chapa-Garza* on three grounds. First, the majority distinguished *Chapa-Garza* by observing that *Chapa-Garza* did not purport to interpret § 2L1.2.[3] 319 F.3d at 197. As a second point of distinction, the majority pointed out that the crime of felony DWI, which is committed when a defendant with two prior convictions begins operating a vehicle while intoxicated, could be committed without the use of force. *Id.* at 198. As a third point of distinction the majority emphasized that the felony DWI statute at issue in *Chapa-Garza* was not analyzed under 18 U.S.C. § 16(a), the language of which is similar to § 2L1.2, Application Note 1(B)(ii)(I). *Id.* The majority characterized § 16(b), under which *Chapa-Garza was* decided, as a "catch-all" provision, and opined that "*Chapa-Garza*'s analysis of § 16(b) would have been entirely unnecessary had the crime of Texas felony DWI contained as an element the 'use of force,' as does the Texas crime of intoxication assault at issue in this case." *Id.* The majority therefore concluded that "[i]n light of the plain language of the revised guideline and its commentary," no state of mind requirement should be implied in § 2L1.2. *Id.* at 199.

---

[3]*Chapa-Garza* was decided under 18 U.S.C. § 16(b), a predecessor of § 2L1.2 (the guideline at issue in the present appeal). Chapa-Garza's sentence was enhanced by the district court because it determined that DWI was an aggravated felony. An aggravated felony was, in turn, defined as, among other things, a crime of violence. Section 16(b) of Title 18 provided that a crime of violence was "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Cf.* § 2L1.2 (2000) (defining a crime of violence as "an offense under federal, state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another").

5

The dissent from the panel majority's ruling in *Vargas-Duran* argued that "use", by its very definition, requires intent. 319 F.3d at 201 (Clement, J., dissenting). Because intoxication assault encompasses an act that takes place "by accident or mistake", the dissent reasoned that intoxication assault does not necessarily require the use, attempted use, or threatened use of force. *Id.* at 204.

Vargas-Duran timely filed a petition for rehearing *en banc* on January 30, 2003. By court order, rehearing *en banc* was granted on June 26, 2003, and the panel opinion was vacated. *United States v. Vargas-Duran*, 336 F.3d 418 (5th Cir. 2003).

## II. STANDARD OF REVIEW

Because the grant of *en banc* rehearing vacates the earlier panel decision, we review *de novo* a district court's legal conclusions or interpretations of the meaning of a guideline. *United States v. Griffin*, 324 F.3d 330, 365 (5th Cir. 2003). We therefore review a challenge to the district court's application of § 2L1.2 *de novo*. *United States v. Rodriguez-Rodriguez*, 323 F.3d 317, 318 (5th Cir. 2003).

## III. DISCUSSION

A. "Use of Force"

The first issue before the Court is whether "the use, attempted use, or threatened use of physical force against the person of another," U.S.S.G. § 2L1.2, Application Note 1(B)(ii)(I), means that the predicate offense requires that a defendant intentionally avail himself of that force. We hold that it does.

It is an elementary rule of statutory construction that "the words of a statute will be given their plain meaning absent ambiguity." *Texas Food Indus. Ass'n v. United States Dept. of Agric.*, 81 F.3d 578, 582 (5th Cir. 1996). Similarly, a statute should be construed such that no word is left

without operative effect. *Texaco Inc. v. Duhé*, 274 F.3d 911, 920 (5th Cir. 2001). We are bound to follow each Sentencing Guideline; commentary is also authoritative if not plainly erroneous or inconsistent with the guidelines. *United States v. Urias-Escobar*, 281 F.3d 165, 167 (5th Cir. 2002). Guidelines, and thus their commentary, are subject to the ordinary rules of statutory construction. *United States v. Carbajal*, 290 F.3d 277, 283 (5th Cir. 2002).

Because "use" is not defined by the Sentencing Guidelines, we first look to its plain meaning. Beginning with the definition as commonly understood within the legal community, "use" means "[t]he application or employment of something." BLACK'S LAW DICTIONARY 1540 (7th ed. 1999). In more broad-based English application, "use" is defined as "[t]he act of employing a thing *for any . . . purpose*; the fact, state, or condition of being so employed; utilization or employment for or *with some aim or purpose*, application or conversion *to some . . . end*." 19 THE OXFORD ENGLISH DICTIONARY 350 (2d ed. 1989) (emphasis added).[4] Similarly, another dictionary observes that "SERVICE, ADVANTAGE, PROFIT, ACCOUNT, AVAIL, and USE have in common a sense of a useful or valuable *end, result, or purpose*. USE stresses the practicality of the end, result, or *purpose* for which something is employed." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY

_____

[4]Lest this Court be accused of selectively defining "use" to comport with the result reached in this case, we hasten to add that other dictionaries have similarly defined the term. According to The American Heritage Dictionary, "use" means "[t]o put into service or apply for a purpose; employ." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1894 (4th ed. 2000). The verb form of "use" as stated in the Encarta World English Dictionary is defined as meaning "to employ something for some purpose or to put something into action or service," while the noun form is defined as "the act of using something for a particular purpose." ENCARTA WORLD ENGLISH DICTIONARY 1956 (1999). One Webster's dictionary gives the primary definition of "use" as "the act or practice of employing something," and a secondary definition as "to put into action or service: avail oneself of: employ." WEBSTER'S NEW COLLEGIATE DICTIONARY 1279 (6th ed. 1979). Finally, "use" has been defined as "the act or practice of using something: employment," or "to put into action or service." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 2523 (1993).

OF THE ENGLISH LANGUAGE UNABRIDGED 2523 (1993) (emphasis added).[5] The overwhelming majority of authority on the plain meaning of "use" contemplates the application of something to achieve a purpose. Supplementing the word "force" in place of the indeterminate object "something" in the aforementioned dictionary definition bears out this meaning: "use of force" means "the act of employing force for any . . . purpose," or "to avail oneself of force." Because we conclude that the meaning of "use of force" is free of ambiguity, we therefore hold that the plain meaning of the word "use" requires intent.

Our adoption of the plain meaning of "use" is further supported by the rule of statutory interpretation that requires us, when possible, to give each word in a statute operative effect. This rule of construction dictates that the word "use" must have an operative effect when left standing alone, or when modified by either "attempted" or "threatened." Both an attempt and a threat require intent. *See* BLACK'S LAW DICTIONARY 123, 1489 (7th ed. 1999) (defining "attempt" and "threat"). Were we to interpret "use of force" inconsistently with its plain meaning – that is, as capable of being performed without intent – we would effectively nullify the state of mind required by "attempted use" and "threatened use." For how could one intentionally attempt to unintentionally use force, or intentionally threaten to unintentionally use force? The force, so to speak, of this

---

[5]We recognize that a member of this Court in dissenting from our denial of *en banc* rehearing in *United States v. Chapa-Garza*, 262 F.3d 479, 482 (5th Cir. 2001), used an earlier Webster's dictionary synonym explication of "use" to buttress his claim that "without question, force may be used accidentally." The dissent observed that "Webster's list of synonyms specifies 'USE is general and indicates any putting to service of a thing, *usu.* for an intended or fit purpose'. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (Merriam-Webster 1986). This suggests, of course, that a purpose is not always intended." *Id.* at 482, n. 2. As the more recent edition of Webster's Third New International Dictionary of the English Language Unabridged omits the "usually" adverbial restriction on purpose, we believe the clear weight of authority suggests that "use of force" requires that one intentionally avail himself of that force.

rhetorical question only bolsters our belief that "use" requires intent.

Our adoption of the plain meaning of the word "use" is supported by our caselaw as well.[6] In *United States v. Chapa-Garza*, 243 F.3d 921 (5th Cir. 2001), we held that the crime of felony DWI under Texas law was not a crime of violence, because "[*i*]*ntentional* force against another's person or property is virtually never employed to commit this offense." *Id.* at 927. At issue in *Chapa-Garza* was whether felony DWI fit within the 18 U.S.C. § 16(b) definition of crime of violence as an offense "that is a felony and that, by its nature, involves a substantial risk that *physical force* against the person or property of another *may be used* in the course of committing the offense." *Id.* at 924 (citations omitted) (emphasis added). We first declined to read § 16(b) in the same way in which we read U.S.S.G. § 4B1.2(a)(2). *Id.* at 926. Although we hinged that decision on § 16(b)'s emphasis on the use of force during the commission of the offense, an equally valid basis for distinction is the fact that § 4B1.2(a)(2) does not mention *either* "use" or "force." *Id.* at 925. We went on to avow that "[t]he criterion that the defendant use physical force against the person or property of another is most reasonably read to refer to intentional conduct, not an accidental, unintended event." *Id.* at 926. Relying in part on the Third Circuit's elucidation of "use of force" in *United States v. Parson*, 955 F.2d 858 (3rd Cir. 1992), we concluded that the dictionary definitions

---

[6]There is a Circuit split on the issue of whether "use of force" in the context of Sentencing Guidelines requires intent. *See United States v. Lucio-Lucio*, No. CR-02-1403WPJ, 2003 WL 22436260, at *3 (10th Cir. Oct. 28, 2003) (ruling that the "use of force" contemplated by § 16(b) "carries a connotation of at least some degree of intent"); *Bazan-Reyes v. INS*, 256 F.3d 600, 609, 611 (7th Cir. 2001) (holding that "use of force" as contemplated by § 16(a) and § 16(b) requires intentional use). *But see United States v. Gonzales-Lopez*, 335 F.3d 793, 799 (8th Cir. 2003) (holding that "the definition of crime of violence contained in § 2L1.2(b)(1) does not contain a volitional element"); *United States v. Bonilla-Montenegro*, 331 F3.d 1047, 1051 (9th Cir. 2003) (finding that designation of an offense as a crime of violence does not require the intentional use of force; recklessness will suffice).

of "use" indicate that the word "refers to volitional, *purposeful*, not accidental, employment of whatever is being 'used'." 243 F.3d at 926.

Nothing in our opinion in *Chapa-Garza* encouraged a reading restricting our plain-meaning analysis of the word "use" to the context of only § 16(b). Section 16(b)'s dictate that "physical force . . . may be used" does not differ substantially from § 2L1.2's "use of force" requirement. The distinction we made between the application of force against the body of another does not necessarily mean that the use of that force was intentional.

Indeed, an example given in *Chapa-Garza* is not unlike the crime of intoxication assault. In the example posited, we believed that force was *not* intentionally used. We observed that

> [w]hile the victim of a drunk driver may sustain physical injury from physical force being applied to his body as a result of collision with the drunk driver's errant automobile, it is clear that such force has not been intentionally "used" against the other person by the drunk driver at all, much less in order to perpetrate any crime, including the crime of felony DWI.

243 F.3d at 927. The distinction we made then between force applied against the body of another and force intentionally used against the body of another is one we uphold here.

Our ruling today is also consistent with the result we reached in *United States v. Gracia-Cantu*, 302 F.3d 308 (5th Cir. 2002). Gracia-Cantu's sentence was enhanced for a prior Texas felony conviction for injury to a child,[7] which the PSR claimed constituted a crime of violence. 302 F.3d at 311. On appeal, it was persuasively argued by Gracia-Cantu and eventually conceded by the Government that § 16(a) was inapplicable to Gracia-Cantu's predicate offense because "the statutory

_____

[7]Injury to a child is committed when a person "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual: (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury." TEX. PENAL CODE ANN. § 22.04(a) (2002).

10

definition of the offense does not explicitly require the application of force as an element." *Id.* at 312.

Although we did not further address § 16(a) because of this concession, we now observe that this interpretation of § 16(a) is consistent with our view that "use of force" requires intent.[8]

B.       "An Element"

Because the panel held that the use of force was an element of the offense of intoxication assault, we turn now to address whether the intentional use of force is an element of the crime of intoxication assault.  We hold that it is not.

As we have earlier noted, § 2L1.2 allows enhancement when the statute has "as an *element* the use, attempted use, or threatened use of force."   U.S.S.G. § 2L1.2, Application Note 1(B)(ii)(I) (2001) (emphasis added).  Thus, Vargas-Duran's sentence enhancement depends not only upon the meaning of the word "use", but also upon whether the predicate offense has the use of force as an element of the crime.[9]  In our current legal terminology, an element is "[a] constituent part of a claim that must be proved for the claim to succeed."  BLACK'S LAW DICTIONARY 538 (7th ed. 1999). Thus, in order for § 2L1.2 to apply, the intentional use of force must be "a constituent part of a claim that must be proved for the claim to succeed." *See United States v. Williams*, 343 F.3d 423, 432 (5th Cir. 2003) (observing that "[t]raditionally, an 'offense' was defined by its 'elements,' i.e., facts necessary to support a conviction for the offense").  If any set of facts would support a conviction without proof of that component, then the component most decidedly is not an element – implicit or

---

[8]This interpretation also comports with our assessment, *infra*, that not only must force be used intentionally, but such use must also be "an element" of the predicate offense.

[9]The panel explicitly ruled that "[b]ecause the Texas crime of intoxication assault has *as an element* the use of force against the person of another, we conclude that the district court did not err in imposing the 16-level enhancement." *Vargas-Duran*, 319 F.3d 194, 199 (5th Cir. 2003) (emphasis added).

explicit – of the crime. More specifically, in the case of Vargas-Duran, intentional use of force would have to be an element of the crime of intoxication assault – that is to say that no conviction would be upheld absent proof that the defendant intentionally used force against the person of another. But a requirement that a defendant intentionally use force is simply not an element that needs to be proved under Texas law.

The Texas crime of intoxication assault requires that a prosecutor prove that the defendant (1) by accident or mistake, (2) while operating a motor vehicle in a public place while intoxicated, (3) by reason of that intoxication causes serious bodily injury to another. TEX. PENAL CODE ANN. § 49.07 (1994). Texas courts have held that the very words "by accident or mistake" plainly dispense with any *mens rea* requirement. *Stidman v. State*, 981 S.W.2d 227, 230 (Tex. App. 1998). Therefore, all that need be proved for a conviction is an intoxicated driver's operation of a motor vehicle in a public place that results in a serious bodily injury to another. No *mens rea* need be established for prosecution.[10]

Further, the fact that the statute requires that serious bodily injury result from the operation of a motor vehicle by an intoxicated person does not mean that the statute requires that the defendant have used the force that caused the injury. All that the statute requires is that a bodily injury occur and that the injury was causally linked to the conduct of the defendant. No facts beyond these need be established in order for a conviction to lie.

---

[10]Our ruling on the "element" requirement of this Sentencing Guideline is consistent with that of the Second Circuit in *Chrzanoski v. Ashcroft*, 327 F.3d 188 (2d Cir. 2003). In *Chrzanoski*, the Government argued that, while the state statute in question did not expressly identify "the use, attempted use, or threatened use" of physical force as an element, it was implicit in the statute's requirement that physical injury be caused. *Id.* at 193. The Second Circuit rejected the Government's argument and concluded that there was a difference between the use of force and the causation of injury. *Id.* at 194. We agree.

Looking only at the fact of Vargas-Duran's conviction and the statutory definition of intoxication assault, it is clear that the intentional use of force against the person of another is not a necessary component of the offense. The prosecution of Vargas-Duran for the predicate offense in no way rested on proof of any *mens rea*, much less intent. There is also a difference between a defendant's causation of an injury and the defendant's use of force. Consequently, Vargas-Duran's use of force was simply not a fact necessary to support his conviction for intoxication assault. Because the use of force is not an element of the offense of intoxication assault, Vargas-Duran's sentence was improperly enhanced.

## IV. CONCLUSION

For the foregoing reasons, the enhanced sentence applied by the district court is VACATED, and we REMAND this case for resentencing in accordance with this opinion.

EMILIO M. GARZA, Circuit Judge, joined by BARKSDALE, Circuit Judge, dissenting:

The court's opinion holds that "use" within the context of U.S. SENTENCING GUIDELINES MANUAL § 2L1.2 (2001) means "intentional use."[11] This holding is inconsistent with the plain language of the sentencing guidelines, and it leads to unsound results for other guidelines where the Sentencing Commission actually includes mens rea elements modifying the term "use." Further, this holding ignores the Sentencing Commission's recent revision of U.S.S.G. § 2L1.2, and is inconsistent with the rationale of *United States v. Chapa-Garza*, 243 F.3d 921 (5th Cir. 2001). Absent this Court's addition of the mens rea element of intent to the verb "use," it is clear that the Texas intoxication assault statute is a crime of violence for purposes of U.S.S.G. § 2L1.2. Accordingly, I respectfully dissent.

The 2001 version of U.S.S.G. § 2L1.2, under which Vargas-Duran was sentenced, provides a 16-level sentence enhancement to a base offense level of 8 "[i]f the defendant previously was deported, or unlawfully remained in the United States, after) ) (A) a conviction for a felony that is . . . (ii) a crime of violence. . . ." U.S.S.G. § 2L1.2(b)(1)(A)(ii). Application Note 1 of the guideline defines "crime of violence" for purposes of § 2L1.2(b)(1) as "an offense under

---

[11] There is confusion among the circuit courts regarding the mens rea requirements for "use of force." *Compare United States v. Gonzalez-Lopez*, 335 F.3d 793, 798-99 (8th Cir. 2003) (holding that "crime of violence" under the 2001 version of U.S.S.G. § 2L1.2 contains no volitional element); *Park v. I.N.S.*, 252 F.3d 1018, 1021-23 (9th Cir. 2001) (holding that a crime of violence under § 16(a) and (b) does not require specific intent); *Tapia-Garcia v. I.N.S.*, 237 F.3d 1216, 1222-23 (10th Cir. 2001) (similar holding); *United States v. Santana-Garcia*, 211 F.3d 1271, No. 98-2235, 2000 WL 491510, at *2-3 (6th Cir. Apr. 18, 2000) (unpublished) (similar holding); *Le v. U.S. Attorney Gen.*, 196 F.3d 1352, 1354 (11th Cir. 1999) (similar holding); *with Bazan-Reyes v. INS*, 256 F.3d 600, 608-12 (7th Cir. 2001) (relying on definition of "use" as an intentional act to hold that state crimes of DWI and homicide by intoxicated use of a vehicle were not "crimes of violence" under 18 U.S.C. § 16(b)); *Dalton v. Ashcroft*, 257 F.3d 200, 206-08 (2d Cir. 2001) (holding that "use" is an intentional act); *United States v. Parson*, 955 F.2d 858, 866 (3d Cir. 1992) (similar holding).

14

federal, state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another. . . ." U.S.S.G. § 2L1.2, cmt. n.1(B)(ii)(I) (2001).[12]

Despite the plain language of the § 2L1.2 crime of violence definition, the court's opinion inserts the word "intentional" before the word "use." There is no mens rea language with respect to the "use of force" element in the § 2L1.2 definition. *Cf. United States v. Gonzalez-Lopez*, 335 F.3d 793, 798 (8th Cir. 2003) ("[T]he text of the [§ 2L1.2] definition mentions only the actus reas [sic] and is silent as to the mens rea) ) or intent element."). Although there is a presumption that *criminal statutes* include an element of mental culpability, and strict liability crimes are disfavored, *see, e.g.*, *Staples v. United States*, 511 U.S. 600, 606, 114 S. Ct. 1793, 128 L. Ed. 2d 608 (1994), the "use of force" requirement in § 2L1.2 is part of a strict liability 16-level *sentencing enhancement* and not part of a strict liability *criminal statute*. *See United States v. Singleton*, 946 F.2d 23, 26 (5th Cir. 1991) ("Singleton was not convicted of a strict liability *crime* but instead was subject to a strict liability *sentencing enhancement*.") (emphasis in original). Even though criminal intent is a required part of the crime constituting the defendant's underlying conviction, criminal intent is not necessarily a consideration for the district court in the sentencing phase. *Id*.

---

[12]The complete text of the 2001 version of § 2L1.2's crime of violence definition for purposes of subsection (b)(1) is:
> "Crime of violence") )
>
> > (I) means an offense under federal, state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another; and
> >
> > (II) includes murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses (including sexual abuse of a minor), robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling.

U.S.S.G. § 2L1.2 cmt n.1(B)(ii) (2001).

at 26-27. Thus, whether the district court must consider the mens rea of the defendant's underlying conviction depends upon the language of the sentencing guidelines.

"The guidelines drafters have been explicit when they wished to import a mens rea requirement." *Singleton*, 946 F.2d at 25. The crime of violence definition under U.S.S.G. § 2L1.2 contains no mens rea language. In contrast, the other section within subpart 2L1 of the sentencing guidelines does include mens rea language. *See* U.S.S.G. § 2L1.1(b)(5) ("If the offense involved *intentionally* or *recklessly* creating a substantial risk of death or serious bodily injury to another person . . . .") (emphasis added).[13] Previously, this Court has refused to read a mens rea requirement into a sentencing guideline absent explicit direction to do so. *See United States v. Fry*, 51 F.3d 543, 546 (5th Cir. 1995) (holding that, where "the language of section 2K2.1(a)(3) makes no reference to the defendant's mental state, . . . [t]he section is plain on its face and should not . . . be read to imply a scienter requirement."); *Singleton*, 946 F.2d at 25 ("Because statutory sections are to be construed as coherent wholes, the precision of the drafters in including mens rea in neighboring sections indicates that the reason that [§2K2.1] does not use the word

---

[13] *See also* U.S.S.G. § 2L2.1(b)(3) ("If the defendant *knew*, *believed*, *or had reason to believe* that a passport or visa was to be used to facilitate the commission of a felony offense . . .") (emphasis added); U.S.S.G. § 2K1.3(b)(2) ("If the offense involved any explosive material that the defendant *knew* or *had reason to believe* was stolen . . .") (emphasis added); U.S.S.G. § 2K1.3(b)(3) ("If the defendant *used* or possessed . . . any explosive material with *knowledge*, *intent*, or *reason to believe* that it would be *used* or possessed in connection with another felony offense . . .") (emphasis added); U.S.S.G. § 2K1.3(c)(1) ("If defendant . . . possessed or transferred any explosive material with *knowledge* or *intent* that it would be *used* or possessed in connection with another offense . . .") (emphasis added); U.S.S.G. § 2K1.4(a)(1) ("[I]f the offense (A) created a substantial risk of death or serious bodily injury to any person . . ., and that risk was created *knowingly*. . .") (emphasis added); U.S.S.G. § 2K1.4(c)(1) ("If . . . the offense was *intended* to cause death or serious bodily injury . . .") (emphasis added); U.S.S.G. § 2K1.5(b)(1) ("If the offense was committed *willfully* and *without regard for the safety of human life*, or with *reckless disregard* for the safety of human life . . .") (emphasis added); U.S.S.G. § 2K1.5(a)(3) ("If . . . he acted with mere *negligence* . . .") (emphasis added).

16

"knowingly" is that the drafters did not wish such a requirement to apply."); *cf. United States v. Myers*, 104 F.3d 76, 81 (5th Cir. 1997) ("As a straightforward matter of textual interpretation, we will not presume that a statutory crime requires specific intent in the absence of language to that effect."). The fact that the guideline drafters specifically used mens rea language in § 2L1.1 and not in § 2L1.2 indicates they did not intend the term "intentional" to be included before "use" for purposes of § 2L1.2.

Furthermore, interpreting "use" to mean "intentional use" in every sentencing guideline, in accordance with the court's opinion, leads to curious results. For example, applying the reasoning of the court's opinion to U.S.S.G. § 2K1.3(b)(3) and inserting the mens rea element "intentional" before the verb "use" would change § 2K1.3(b)(3) to: "If the defendant [intentionally] used or possessed . . . any explosive material with knowledge, intent, or reason to believe that it would be [intentionally] used or possessed in connection with another felony offense . . . ." Thus, the court's opinion makes the mens rea language purposely included by the Sentencing Commission in this guideline superfluous,[14] and departs from clear precedent governing statutory construction.

---

[14]The court's opinion claims "we would effectively nullify the state of mind required by 'attempted use' and 'threatened use'" in the § 2L1.2 crime of violence definition by not reading a mens rea requirement into the meaning of the term use because "attempt and threat require intent." An "attempted use" or "threatened use" of force is a discrete action and by definition is not the "use" of force. As the definitions cited in the court's opinion indicate, "intent" is specifically included in the terms "attempt" and "threat." *See* BLACK'S LAW DICTIONARY 127 (defining attempt as "[a]n *intent* to commit a crime couple with an act taken toward committing the offense") (emphasis added); BLACK'S LAW DICTIONARY 1480 (defining threat as "a communicated *intent* to inflict physical or other harm on any person or property") (emphasis added). Intent, however, is not specifically included in the verb "use" itself. The absence of a mens rea associated with the "use of force" does not mean force cannot be used intentionally, rather it means that force can be used negligently, recklessly, *or* intentionally. *See, e.g.*, TEX. PENAL CODE ANN. § 49.07(a)(1) (Vernon 1994) (defining Texas intoxication assault as the situation where a defendant "by *accident or mistake* . . . while operating a motor vehicle in a public place while intoxicated, by reason of that intoxication causes serious bodily injury to

17

*See United States v. Menasche*, 348 U.S. 528, 538-39, 75 S. Ct. 513, 99 L. Ed. 615 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (internal citations omitted); *United States v. Marek*, 198 F.3d 532, 536 (5th Cir. 1999) ("A statute should be interpreted so as to give each provision significance.") (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S. Ct. 1011, 117 L. Ed. 2d 181 (1992)); *see also* 2A SUTHERLAND STATUTORY CONSTRUCTION § 46.06 (6th ed. 2000) ("A statute should be construed so that effect is given to all its provisions, so that no part would be inoperative or superfluous.").

To justify its holding that "use" means "intentional use," the court's opinion cites to various dictionary definitions. However, by exclusively relying on dictionary definitions, the court's opinion ignores the Sentencing Commission's understanding of the term "use" as demonstrated by other guidelines, and disregards clear Supreme Court precedent requiring that the meaning of a statutory provision must be determined within the context of the whole act and not in isolation. *See U.S. Nat'l Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L. Ed. 2d 402 (1993) ("Over and over we have stressed that 'in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'") (quoting *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122, 12 L. Ed. 1009 (1849)). I do not dispute that dictionaries are useful tools that assist this court in determining the plain meaning of ambiguous terms. However, before deciding that a term is ambiguous and turning to outside sources we must consider whether other provisions within a particular statute lend clarity to that term. *See, e.g.*, *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S. Ct. 570, 116 L. Ed. 2d 578 (1991) ("[T]he

---

another.')

18

meaning of statutory language, plain or not, depends on context.") (internal citations omitted); *K Mart Corp. v. Cartier Inc.*, 486 U.S. 281, 291, 108 S. Ct. 1811, 100 L.Ed. 2d 313 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").

The meaning of a term should be determined by considering its context within the whole statute in which the term appears. This is a more appropriate indication of what the drafters of that statute understood a particular term to mean than is an outside dictionary definition. This is especially true in the case of the Sentencing Guidelines because the Commission has extensive expertise in this area, promulgates the guidelines in an effort to implement a cohesive policy, and constantly revises the guidelines in an effort to maintain internal consistency. As the preceding discussion indicates, there is no ambiguity surrounding the term "use" when the Sentencing Guidelines are considered as a whole. It is clear that the Sentencing Commission does not understand the verb "use" to inherently include any mens rea element. Thus this Court should not impose a mens rea element upon that verb when the Sentencing Commission has declined to explicitly do so.

In addition to misapplying fundamental principles of statutory construction, the reliance by the court's opinion upon *Chapa-Garza* is misguided. First, *Chapa-Garza* held that "use" means "intentional use" within the context of the 2000 version of U.S.S.G. § 2L1.2's definition of a crime of violence, not under the revised 2001 version of this guideline. *Chapa-Garza*, 243 F.3d at 923. Unlike the 2001 version of § 2L1.2, the 2000 version did not contain its own guideline-specific definition of a crime of violence. Instead, the 2000 definition was found, through a series of cross-references, in 18 U.S.C. § 16. The only portion of the definition considered in *Chapa-Garza* was

19

18 U.S.C. § 16(b).  *See Chapa-Garza*, 243 F.3d at 924.  Section 16(b) provides that in addition to the offenses described in § 16(a), this crime of violence definition also includes offenses where there was a "substantial risk that physical force . . . may be used."  18 U.S.C. § 16(b).  Based upon this language, *Chapa-Garza* held that a crime of violence occurred when there is "a substantial likelihood that the perpetrator will intentionally employ physical force." *Chapa-Garza*, 243 F.3d at 926.  The § 16(b) "substantial risk that physical force . . . may be used" language is different from the "use . . . of physical force" language found in the 2001 § 2L1.2 crime of violence definition.  Furthermore, the purposes served by these two clauses, as demonstrated by the statutory structure of their respective definitions, are not comparable.[15]  Thus, our past interpretation of 18 U.S.C. § 16(b) in *Chapa-Garza* should not control our interpretation of the "use of force" language from the first part of the 2001 crime of violence definition in this case.

---

[15] Section 16 and § 2L1.2 are two of the eight versions of a "crime of violence" definition in the United States Code and in the United States Sentencing Guidelines.  *See United States v. Charles*, 301 F.3d 309, 316  (5th Cir. 2002) (*en banc*) (DeMoss J. concurring).  These crime of violence definitions usually have a similar two part structure.  Like § 16 and § 2L1.2, the first part usually contains some version of the "use, attempted use, or threatened use of [ ] force" language with slight modifications.  The second part differs among the definitions, modifying the first part in varying ways.  Some of "these definitions are closed-ended and self-contained; and others of these definitions have catch-all clauses which invite speculation." *Id.*  Guideline 2L1.2 is an example of the category of definitions where the second part is closed-ended while § 16(b) is an example of a second part containing a catch-all clause inviting speculation.  Accordingly, the purpose of the "use of force" language in the first part of the § 2L1.2 definition is different from the language in the second part of 18 U.S.C.§ 16.  Relying upon *Chapa-Garza* in this case ignores the purpose served by the separate components of a crime of violence definition.  Although the confusion caused by these various definitions is regrettable, "blame for this state of disarray falls squarely on the shoulders of Congress . . . and on the Sentencing Commission," and"[i]t is not the task of the Judicial Branch to say which of these varying definitions the Congress intended to be controlling; nor is it the task of the Judicial Branch to make specific what Congress has failed to specify." *Charles*, 301 F.3d at 316.

Second, under the rationale of *Chapa-Garza*, the nature of the 2001 revision of § 2L1.2 counsels against relying upon previous interpretations of 18 U.S.C. § 16 in this case. *Cf. Chapa-Garza*, 243 F.3d at 926. In *Chapa-Garza* we refused to interpret the crime of violence definition in 18 U.S.C. § 16(b) consistently with previous interpretations of the U.S.S.G. § 4B1.2(a) crime of violence definition. *Chapa-Garza*, 243 F.3d at 926. We held that comparison was inappropriate because the Sentencing Commission had previously changed the U.S.S.G. § 4B1.2(a) crime of violence definition from a cross reference to 18 U.S.C. § 16 to a self-contained definition. *Chapa-Garza*, 243 F.3d at 926. Yet, the court's opinion in this case ignores the Sentencing Commission's choice to replace a cross reference to § 16 with a self-contained crime of violence definition in § 2L1.2. It found no significant difference between the two guidelines, thus going against the rationale expressed in *Chapa-Garza*.[16]

Third, reliance upon *Chapa-Garza* for the proposition that "use" means "intentional use" disregards the impact of the revised structure of § 2L1.2. In the Sentencing Commission's effort to create a more graduated sentence enhancement system under U.S.S.G. § 2L1.2, the Commission included four separate enhancement levels in the 2001 version of the guideline rather than the two separate enhancement levels contained in the 2000 version. *See* U.S.S.G. App. C,

---

[16] Based upon the rationale of *Chapa-Garza*, it is even more appropriate to distinguish the 2001 § 2L1.2 crime of violence definition from the 18 U.S.C. § 16 crime of violence definition because there are more significant differences between these definitions than between those considered in *Chapa-Garza* itself. Specifically, the language of U.S.S.G. § 4B1.2(a), which *Chapa-Garza* distinguished, is closer to that of 18 U.S.C. § 16 than 18 U.S.C. § 16 is to the language of the crime of violence definition in the 2001 version of U.S.S.G. § 2L1.2. *See* U.S.S.G. § 2L1.2, cmt. n.1(B)(ii)(II). *But see* U.S.S.G. § 4B1.2(a)(2) (including within the definition, in addition to the listed crimes, other crimes which "present[] a serious risk of physical injury"); 18 U.S.C. § 16(b) (including within the definition additional crimes involving a "substantial risk that physical force . . . may be used," and not listing any specific offenses).

21

amend. 632; *see also United States v. Caicedo-Cuero*, 312 F.3d 697, 709-11 (5th Cir. 2002) (discussing the 2001 amendments to § 2L1.2's definition of "crime of violence" and the impact of having multiple definitions of the same term within the same guideline). The aggravated felony definition of 8 U.S.C. § 1101(a)(43), and its cross reference to the 18 U.S.C. § 16 crime of violence definition, included in the 2000 version of § 2L1.2 were retained, but the Commission reduced the sentencing enhancement for an aggravated felony from 16 levels to 8 levels. U.S.S.G. § 2L1.2(b)(1)(C), cmt. n.2 (2001). As previously discussed, this crime of violence definition was the one *Chapa-Garza* interpreted. The Commission then added new definitions for those crimes serious enough to merit a 16-level enhancement, including the crime of violence definition at issue in this case. It is clear that the Commission intended these definitions to have different meanings because it drafted a new crime of violence definition, retained the prior aggravated felony definition, and assigned different sentence enhancements to each definition. Thus, the court's opinion counteracts the Commission's efforts by relying on the *Chapa-Garza* definition of use, which interprets a statutory definition that the revised structure of the guidelines indicates does not have the same meaning as the crime of violence definition in this case.

Without a mens rea element inappropriately added to the term "use" in U.S.S.G. § 2L1.2, it becomes clear that Vargas-Duran's underlying conviction for felony intoxication assault is a "crime of violence" for purposes of the 16-level enhancement in § 2L1.2(b)(1)(A). Intoxication assault punishes a defendant if "by accident or mistake . . . while operating a motor vehicle in a public place while intoxicated, by reason of that intoxication causes serious bodily injury to another." TEX. PENAL CODE ANN. § 49.07(a)(1) (Vernon 1994). "Serious bodily injury" is defined as "injury that creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss

22

or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 49.07(b) (Vernon 1994).

Intoxication assault involves the use of force. As the Eighth Circuit recently recognized in an automobile homicide case, "use of force" involves two components))use and force. *Gonzalez-Lopez*, 335 F.3d at 798-99. An automobile by its very nature embodies force. *Id*. (citing *Omar v. I.N.S.*, 298 F.3d 710, 717 (8th Cir. 2002) ( "[A] vehicle can exert considerable physical force because of its structure, weight and capacity for motion and velocity.")). Furthermore, the drunk driver is clearly using and employing the force embodied in the motor vehicle by operating it. *Gonzalez-Lopez*, 335 F.3d at 799. Finally, the state intoxication assault statute ties the drunk driver's use together with the force of the automobile through its requirement that the "serious bodily injury" result from the driver's intoxication "while operating the motor vehicle." TEX. PENAL CODE ANN. § 49.07 (Vernon 1994). *Cf. Gonzalez-Lopez*, 335 F.3d at 799 (holding that a statute's requirement that a driver cause the death of another "ties the use of physical force [of the automobile] with the requirement that the force be used against another person").

The actions punished by the intoxication assault statute involve instances where the defendant drove his car while drunk and hit a pedestrian, another vehicle, or a stationary object causing serious bodily harm to another. In the hands of a drunk, a motor vehicle is as likely to inflict physical force as a firearm.[17] There are no Texas state law cases where intoxication assault

---

[17] "Alcohol-involved crashes resulted in 16,792 fatalities, 513,000 nonfatal injuries, and $50.9 billion in economic costs in 2000, accounting for 22 percent of all crash costs." Lawrence J. Blincoe et. al., National Highway Traffic Safety Administration, The Economic Impact of Motor Vehicle Crashes 2000 at 2 (2002) *at* http://www.nhtsa.dot.gov/people/economic/EconImpact2000/EconomicImpact.pdf (last visited Nov. 21, 2003). Furthermore, in Texas 1,745 of the 3,725 traffic fatalities were alcohol related in the year 2002. National Highway Traffic Safety Administration, 2002 Annual Assessment of

was prosecuted and actual force was not used to cause the injury.[18]  Even Vargas-Duran admitted in his briefs to this Court that he could not find any Texas intoxication assault case that did not involve one of these scenarios.  The most attenuated intoxication assault fact pattern actually prosecuted was the situation where a drunk driver ran his car into a parked vehicle, and the parked vehicle then struck a small child causing serious injuries.  *See Gonzalez v. Texas*, No. 14-99-00853-CR, 2000 WL 1721159, at *1 (Tex.App.) ) Houston [14th Dist.] Oct. 12, 2000, no pet.) (not designated for publication).  Clearly, even in this situation the defendant used force to cause physical harm.  The Texas intoxication assault statute punishes an intoxicated driver for causing serious bodily injury to another by reason of their operation of a motor vehicle, thus the statute fulfills the "use of force" requirement and is a crime of violence for purposes of the 16-level enhancement in U.S.S.G. § 2L1.2.

In summary, this court's decision abrogates the Sentencing Commission's authority, properly delegated by Congress, to establish the mens rea required for each sentencing guideline. The Sentencing Commission could have included the mens rea element of intent in U.S.S.G. §

Motor Vehicle Crashes 29, 50 (2002) *at* http://www-nrd.nhtsa.dot.gov/pdf/nrd-30/NCSA/Rpts/2003/Assess02BW.pdf (last visited Nov. 21, 2003).  Firearm related fatalities accounted for 28,663 deaths nationwide in the year 2000.  Center for Disease Control, Deaths: Final Data for 2000, 50 National Vital Statistics Reports No. 15 at tbl.18 (2002) *at* http://www.cdc.gov/nchs/data/nvsr/nvsr50/nvsr50_15.pdf (last visited Nov. 21, 2003). Of the 28,663 firearm related fatalities nationwide 1,972 occurred in the state of Texas.  Bureau of Vital Statistics, Texas Department of Health, 2000 Annual Report tbl.18 *at* http://www.tdh.state.tx.us/bvs/stats00/ANNR_HTM/00t18.HTM (last visited Nov. 21, 2003).

[18] Vargas-Duran's conviction is the quintessential Texas intoxication assault case.  Vargas-Duran  was driving while intoxicated, struck a pedestrian who was attempting to cross the street, and fled the scene.  Thus Vargas-Duran caused the precise harm the Texas intoxication assault statute seeks to avoid.  By striking a pedestrian with a motor vehicle Vargas-Duran certainly used force to cause a serious bodily injury.

2L1.2, but the language of that guideline indicates that it did not choose to do so. Moreover, the

court's decision contradicts the rationale of our prior cases interpreting the Sentencing Guidelines.

Accordingly, I respectfully DISSENT.

DeMOSS, Circuit Judge, Specially concurring in part:

I agree with Judge Clement's majority opinion that under the definition of "crime of violence" in the 2001 version of U.S.S.G. §2L1.2 the predicate offense here in Vargas-Duran (i.e., intoxication assault under Tex. Pen. Code Ann. § 49.07) is not a "crime of violence" because:

A.     That predicate offense is not specifically named in the Guideline definition; and

B.     That predicate offense does not have as an element "the use or attempted use or threatened use of physical force against the person of another," as Judge Clement so clearly articulates in Part IIIB of her majority opinion.

I reach this conclusion because neither the word "use" nor the word "force" nor the word "attempted" nor the word "threatened" appears anywhere in the text of the statute defining this predicate offense; nor should these terms be read into that statute by inference.

However, I agree with Judge Garza's dissent that we should not make this decision by relying upon our prior holding in Chapa-Garza because:

A.     That opinion was issued prior to the issuance of the new U.S.S.G. §2L1.2 in 2001; and

B.      This new definition of "crime of violence" does not have any cross-reference to either 8 U.S.C. § 1101 (a)(43)(F), nor to 18 U.S.C. § 16(a) or (b), nor to U.S.S.G. §4B1.2, as did the version of §2L1.2 which was applicable at the time Chapa-Garza was decided.

I find myself in a straddle position, agreeing with the result of Judge Clement's opinion, but disagreeing with Part IIIA of her opinion in which she relies on Chapa-Garza to interpret the language of Application Note 1(B)(ii)(I) as requiring an "intentional use of force." Likewise, I disagree with Judge Garza's interpretation of Tex. Pen. Code Ann. § 49.07 as containing as an element thereof the "use or threatened use or attempted use of physical force against the person of another" so as to come within the language of Note 1(B)(ii)(I), but I agree with much of his dissent, which reviews the history and purpose of the complete change made by the Sentencing Commission in 2001 in the text of §2L1.2 and the importance of construing the definitions of "crime of violence" and "aggravated felony" as set forth therein as new separate free standing definitions.

Given that the district courts of the Fifth Circuit handle more illegal alien cases than other district courts (and our Circuit sees more appeals of these cases than any other Circuit) and given that most of these illegal alien cases involve defendants with prior criminal convictions, I think it would be appropriate, time-saving, and cost-effective to set forth for the benefit of the bench and bar some ground rules and procedures for applying the new §2L1.2. Towards that end I make the following suggestions:

**Ground Rules for Interpretation**

27

1. The definitions in Application Note 1(B) of §2L1.2 are expressly limited to subsection (b)(1) of that Guideline.

2. The definition of "crime of violence" in Application Note 1(B)(ii) was inserted by the Sentencing Commission in 2001 and differs significantly from other definitions of "crime of violence" in the criminal code and in the Guidelines. Therefore, any interpretation of this definition in Vargas-Duran should not be derived from other statutes or guidelines where other definitions of that term are used; and any interpretation here in Vargas-Duran is applicable only to cases applying the §2L1.2 Guideline. Similarly, definitions of "crime of violence" prior to the 2001 amendments to §2L1.2 are no longer applicable to sentencing after November 1, 2001, under that Guideline.

3. The new definition of "aggravated felony" in Application Note 2 of §2L1.2 is expressly limited to subsection (b)(1)(C) of that Guideline; and therefore any interpretation of that term here in Vargas-Duran should not be derived from other statutes or guidelines which define that term differently; and any interpretations here in Vargas-Duran are applicable only to cases applying §2L1.2. Likewise, prior definitions of the term "aggravated felony" under prior versions of §2L1.2 are no longer controlling.

4. In adopting the new definitions of "crime of violence" and "aggravated felony" in the 2001 Guidelines, the Sentencing Commission clearly intended to change the type of predicate offenses which would qualify as a "crime of violence." Therefore, we should strictly

28

construe the language used in the 2001 version of "crime of violence" particularly as defined by (B)(ii)(I).

5.    In comparing the language used in the new definition of "crime of violence" it should be noted that:

    A.    Not all of the specifically named offenses in subpart (II) meet the definitional test in subpart (I), which should lead to the conclusion that the specifically named crimes take precedence over the definition; and

    B.    The definition in subpart (I) is identical to 18 U.S.C. § 16(a) except that it omits the words "or property" after the word "person;" which leads to the conclusion that a crime against property which is not specifically named in subpart (II) cannot be a crime of violence under subpart (I).

    C.    The list of specifically named offenses in subpart (II) is the same as the list of offenses which are crimes of violence under the definition in Application Note §4B1.2, but none of the definitions in §2L1.2 include any of the other definitions of a "crime of violence" which appear in §4B1.2, which focus on "conduct that by its nature, presented a serious potential risk of physical injury to another." This difference clearly indicates that in determining what constitutes a "crime of violence" under subpart (I) of §2L1.2, we should not

29

consider 18 U.S.C. § 16(b) which focuses on conduct that "by its nature involves a substantial risk that physical force may be used against another" or §4B1.2 which focuses on "conduct that presents a serious potential risk of physical injury to another."

In view of the foregoing, I propose that we craft a clear and methodical approach for determining sentencing enhancements under the current §2L1.2 for the benefit of the bench and bar. In so doing, it is important to reemphasize that in rendering this proposal for construing the provisions of §2L1.2, I am not suggesting that we attempt to arrive at a one-size-fits-all definition of "crime of violence" that purports to apply to other guideline provisions which utilize the crime of violence terminology. Rather, this is a provision-specific proposal that hopefully adds a little clarity to a much muddled area of the law.

In determining the appropriate sentencing enhancement under §2L1.2, the Guidelines direct courts to "apply the greatest" of the enhancement levels, beginning with the 16-level and ending with the 4-level enhancement. Therefore, whenever the issue for enhancement involving a potential "crime of violence" under §2L1.2 is raised, I would determine the appropriate enhancement level as follows:

**Step 1**: I would determine whether the predicate offense is one of the specifically named offenses found in Application Note 1(B)(ii)(II), which includes "murder, manslaughter, kidnaping, aggravated assault, forcible sex offenses (including sexual abuse of a minor), robbery, arson, extortion, extortionate extension

30

of credit, and burglary of a dwelling." If the predicate offense at issue is one of these listed offenses, a 16-level enhancement is appropriate and no further analysis is required.

**Step 2**:        If the predicate offense is not a specifically named, per se "crime of violence," I would then refer to the general definition found in Application Note 1(B)(ii)(I), which defines "crime of violence" as "an offense under federal, state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another." In determining whether the predicate offense falls under this guideline definition, I would look <u>only</u> to the text of the statutory provision at issue to identify whether the requisite element is present. If the statutory definition does not contain such an element, <u>i.e.</u>, the use, attempted use, or threatened use of physical force against the person of another, then analysis under the 16-level enhancement is complete, making appropriate an analysis of the predicate offense under the 8-level "aggravated felony" definition.[19]

**Step 3**:        To determine whether the predicate offense constitutes an "aggravated offense" warranting an 8-level enhancement, the court should look to the definition provided by 8 U.S.C. § 1101(a)(43), which retains and restores the

---

[19] I recognize that there exists an intermediate 12-level enhancement for felony drug trafficking offenses that carry a sentence exceeding 13 months; however, for the purposes of our inquiry in <u>Vargas-Duran</u>, I have not included this relatively straightforward enhancement in my discussion.

analysis of 18 U.S.C. § 16(a) and (b).  Under § 16(a) and (b), a predicate offense is an "aggravated felony" if it either "has as an element the use, attempted use, or threatened use of physical force against the person <u>or property</u> of another" or is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."

**Step 4**:        If the predicate offense is a felony conviction that does not meet the definitional standard for "aggravated felony" as provided by § 1101(a)(43), the offense automatically receives a 4-level enhancement pursuant to §2L1.2(b)(1)(D).

**Step 5**:        Finally, if the predicate offense is not a felony but rather an aggregate of three or more misdemeanors deemed to be crimes of violence or drug trafficking offenses, the defendant is subject to a 4-level enhancement.

Applying Step 1 of this proposed methodology to the facts in <u>Vargas-Duran</u>, it is clear that intoxication assault is not one of the specifically named offenses found in Application Note 1(B)(ii)(II).  Therefore, the focus of analysis is on Step 2 to determine whether the statute at issue "has as an element the use, attempted use, or threatened use of physical force against the person of another."  One is guilty of intoxication assault in Texas if he "by accident or mistake . . . while operating a motor vehicle in a public place while intoxicated, by reason of that intoxication causes serious bodily injury to another." TEX. PEN. CODE ANN. § 49.07(b).  Nowhere in the text of that statute does there exist an element contemplating the use, attempted use, or threatened use of

32

physical force nor can such an element be read into the statute. The guidelines simply command us to extend our analysis no further than the statutory elements. Therefore, intoxication assault cannot be a "crime of violence" and a 16-level enhancement is improper.

I would next move on to Step 3 and analyze intoxication assault under the lens of an "aggravated felony." Application Note 2 refers us to § 16(a) and (b) where we must decide whether intoxication assault fits within either statutory definition. Section 16(a) is a near identical recitation of the general definition of "crime of violence" found in Application Note 1(B)(ii)(I). The only meaningful difference is the inclusion of one's property in the former. Therefore, as I have already determined that intoxication assault does not involve using, attempting to use, or threatening to use physical force against the person of another, we can similarly conclude that intoxication assault does not contemplate the use of such force against the <u>property</u> of another. Accordingly, I focus on § 16(b).

Section 16(b) applies if the predicate offense is a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." It seems clear to me that this broader definition, which includes such terms as "substantial risk" and "may be used," is sufficient to capture the nature of the conduct in the intoxication assault statute. There is certainly a substantial risk that someone may suffer serious bodily injury as a result of an intoxicated driver's operation of a motor vehicle, whether or not physical force is used in committing the offense. Therefore, because intoxication assault falls under the definition of an "aggravated felony" as contemplated by the Sentencing Guidelines, Vargas-Duran's sentence is subject to an 8-level enhancement.

Bottom line, I would vacate the 16-level enhancement imposed by the district court and remand the case back with specific instructions to apply the 8-level enhancement in accordance with the methodology set forth herein.